UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LYNN LAROCQUE, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | ) C.A. No. 22-CV-00249-MSM-PAS <br> ) |
| SPRING GREEN CORPORATION; <br> SPRING GREEN AT GASPEE POINT, <br> LLC; DIMEO PROPERTIES, INC.; <br> PAMELA COLE, ALIAS; <br> and DAVID P. GARRETT, ALIAS, | ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Lynn Larocque filed this action under the federal Fair Housing Act and the Rhode Island Fair Housing Practices Act against five defendants: Spring Green Corporation; Spring Green at Gaspee Point, LLC; Dimeo Properties, Inc.; the former property manager at Spring Green, Pamela Cole ("Spring Green Defendants"); and Ms. Larocque's neighbor's nephew, David Garrett.[1]  Ms. Larocque alleges that they discriminated against her on a number of occasions between 2014 and 2023 because of her religion and her sexuality, two characteristics protected under both acts.  The

---

[1] Mr. Garrett, proceeding *pro se*, has not moved for summary judgment and thus any claims against him are not the subject of the instant Motion for Summary Judgment.

Spring Green Defendants together move for summary judgment. (ECF No. 36.) For the reasons below, their Motion for Summary Judgment is GRANTED.

## I. BACKGROUND

Spring Green at Gaspee Point is a residential community in Warwick, Rhode Island. (ECF No. 37-1 ¶ 2.) Two types of tenants live there: land tenants and home tenants. *Id.* ¶ 3. Land tenants own their homes and rent the land from Spring Green, usually on twenty-five-year leases, while home tenants lease homes owned by Spring Green, normally on annual or month-to-month leases. *Id.* ¶¶ 4–6.

Ms. Larocque has been a home tenant at Gaspee Point since at least 2014.[2] *Id.* ¶ 9. She is a lesbian woman and, in 2016, she converted to Judaism. (ECF No. 1 ¶¶ 15, 18). She alleges that, throughout her tenancy at Gaspee Point, the Spring Green Defendants have discriminated against her based on those characteristics in three main ways: by enforcing community rules more stringently against her than other tenants, by ignoring her requests for maintenance, and by failing to adequately respond to alleged harassment by Ms. Larocque's neighbor's nephew, David Garrett. (ECF No. 1.)

To resolve this Motion, it is not necessary to recount each and every dispute that's arisen between Ms. Larocque, the Spring Green Defendants, and Mr. Garrett in the past decade. Still, the parties' briefing has made clear that one incident is worth special attention. (ECF No. 40 at 5–7.) Ms. Larocque lives next door to Frances

---

[2] The parties disagree about whether Ms. Larocque's tenancy began in 2012 or 2014, but that fact, along with plenty others the parties disagree over, is immaterial to the resolution of this motion.

Allin, a longtime land tenant. (ECF No. 37-4 at 16.) Mr. Garrett is Ms. Allin's nephew; he does not live with her, but he often helps her upkeep the property, sometimes working in the area between Ms. Allin and Ms. Larocque's residences. (ECF No. 37-5 at 2.) In February 2021, Ms. Larocque discovered a "shell casing for a bullet and a piece of wire fashioned into a noose" on her property, and the following month, she found a hand-drawn swastika on her mailbox. (ECF No. 37-4 at 17; 37-5 at 2.) Because the noose and the bullet were, as Ms. Larocque puts it, "on the side of the property that Mr. Garrett constantly trespasses," she suspected he was responsible for putting all three items on her property. (ECF No. 37-4 at 17.) Soon afterwards, Ms. Larocque reached out to then-property manager Pamela Cole about the items, along with other offensive remarks Mr. Garrett allegedly made to her. (ECF No. 37-5 at 2.) Ms. Cole did not speak with Mr. Garrett about the items or the other incidents. *Id.*

In June 2021, Ms. Larocque filed a Charge of Discrimination with the Rhode Island Commission for Human Rights. (ECF No. 37-5.) There, she alleged that the Spring Green Defendants had discriminated against her based on her sexual orientation and religion since the start of her tenancy. *Id.* at 1. In March 2022, the Commission determined that Ms. Larocque's case lacked probable cause, and it soon provided her with a Notice of Right to Sue. (ECF No. 37-6, 37-7.)

Ms. Larocque filed this action in June 2022, alleging claims under both federal and state housing law. (ECF No. 1.) The Spring Green Defendants now move for summary judgment. (ECF No. 36.)

3

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A dispute is genuine "if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party," and a fact is material "if it carries with it the potential to affect the outcome of the suit under the applicable law." *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000). Conversely, "factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant," here Ms. Larocque, "is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

## III.    DISCUSSION

The Spring Green Defendants raise three main arguments supporting summary judgment. First, they contend that several of Ms. Larocque's claims are barred by the Fair Housing Act ("FHA") and the Rhode Island Fair Housing Practices Act's ("RIFHPA") statutes of limitations. (ECF No. 36-1 at 19.) Next, they argue that Ms. Larocque's claims about maintenance requests and discriminatory enforcement of community rules must fail as a matter of law, most importantly because she does not show that her sexual orientation or religion were a "significant factor" in any alleged conduct. *Id.* at 15–18. Finally, they assert that neither the FHA nor the RIFHPA impose third-party liability, so they cannot be held liable for any of Mr.

4

Garrett's alleged conduct or their failure to intervene. *Id.* at 19. The Court addresses these arguments in turn.

### A.  Statute of Limitations

The first question is procedural: which claims, if any, are barred by the FHA and RIFHPA's statutes of limitations?

The FHA provides that an "aggrieved person" can file suit "not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). Ms. Larocque filed her complaint with this Court on June 27, 2022. (ECF No. 1.) As a result, her federal claims are limited to incidents that occurred on or after June 27, 2020.

Under the RIFHPA, discrimination claims must be filed with the Rhode Island Commission for Human Rights within one year of when "the alleged discriminatory housing practice has occurred or terminated." R.I.G.L. § 34-37-5(b). Ms. Larocque filed her case with the Commission on June 14, 2021. (ECF No. 37-5 at 3.) Winding the clock back a year leads to June 14, 2020. So, her state-law claims are limited to those arising from incidents on or after that date.

In short, Ms. Larocque's claims can only arise from disputes that happened on or after June 12, 2020.

### B.  Disparate Treatment Claims

Turning to the case's substance, Ms. Larocque alleges discrimination based on her sexual orientation and religion in violation of both the FHA and the RIFHPA.

5

Under the FHA, landlords and property managers cannot "discriminate against any person … in the provision of services or facilities in connection" with the sale or rental of a dwelling "because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b). Further, § 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere" with rights afforded in § 3604. Similarly, the RIFHPA forbids discrimination either directly or indirectly "against any individual because of … religion, sex, [or] sexual orientation" in the "furnishing of facilities or services in connection with" renting or selling a dwelling. R.I.G.L. § 34-37-4(a). Because—as the Rhode Island Supreme Court has explained—state caselaw on the RIFHPA is "sparse" and the RIFHPA "closely parallels the federal FHA," the Court can address Ms. Larocque's claims "by referring solely to federal decisions dealing with the FHA." *Andrade v. Westlo Mgmt. LLC*, 276 A.3d 393, 401 (R.I. 2022); *see also Taylor v. Nat'l Investments, Ltd.*, No. 17-117-WES, 2022 WL 306367, at \*4 (D.R.I. Feb. 2, 2022) (same).

The FHA "contemplates three types of claims for perceived discrimination: disparate treatment, disparate impact, and failure to make reasonable accommodations." *Batista v. Cooperativa De Vivienda Jardines De San Ignacio*, 776 F.3d 38, 43 (1st Cir. 2015) (cleaned up). "Although disparate treatment and disparate impact are theories of liability, they are not independent causes of action." *R. I. Com'n for Hum. Rights v. Graul*, 120 F. Supp. 3d 110, 118 (D.R.I. 2015). Instead, "the Court must look at the substance of the charge, focusing on the factual allegations made" that describe "the discriminatory conduct about which a plaintiff is grieving." *Id.*

6

Most of Ms. Larocque's claims, particularly those related to alleged unequal treatment in maintenance requests and the enforcement of community rules, sound in disparate treatment, so the Court will treat them accordingly.[3]

To survive summary judgment on a theory of disparate treatment, the plaintiff must produce either "direct evidence of discriminatory intent" or "indirect evidence creating an inference of discriminatory intent."  *Batista*, 776 F.3d at 44.  Direct evidence is "evidence which, in and of itself, shows a discriminatory animus."  *Zampierollo-Rheinfeld v. Ingersoll-Rand de Puerto Rico, Inc.*, 999 F.3d 37, 51 (1st Cir. 2021).  Ms. Larocque provides no direct evidence that the Spring Green Defendants discriminated or showed animus—more particularly, no admissible antisemitic or homophobic remarks from the Spring Green Defendants.  Because her claims instead arise from indirect evidence, they must be analyzed under the three-step burden-shifting analysis established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *See Graul*, 120 F. Supp. 3d at 118 n.3 (explaining why RIFHPA claims, like FHA claims, should be analyzed using *McDonnell Douglas*).

Under the *McDonnell Douglas* framework, the plaintiff "must carry the initial burden under the statute of establishing a prima facie case" of discrimination.  411

---

[3] The Court assumes, without deciding, that a housing provider's conduct after the plaintiff acquired the dwelling is actionable under the FHA.  Although the First Circuit has not answered the question, at least seven circuits "acknowledge that § 3604(b) prohibits at least some post-acquisition conduct." *See Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 89 (2d Cir. 2021) (en banc) (Lohier, J., concurring) (collecting cases).  Other district courts in this Circuit agree.  *See, e.g., Paulsen v. Great Bridge Attleboro Ltd. P'ship*, 552 F. Supp. 3d 160, 164 (D. Mass 2021).  Because Ms. Larocque fails to provide any evidence of adverse actions or disparate treatment, the Court need not explore the scope of post-acquisition liability today.

U.S. at 802. If the plaintiff meets their burden, the defendant must come forward with a "legitimate, nondiscriminatory reason" for the adverse action. *Id.* If the defendant fails to offer one, then the plaintiff is entitled to judgment as a matter of law. But if the defendant provides a legitimate reason for the action, the burden shifts back to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447–48 (1st Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).

To establish a prima facie case of discrimination at Step One, the plaintiff typically must prove four elements: "(a) membership in a protected group (e.g., race, gender), (b) an adverse action (e.g., failure to be hired), (c) eligibility for favorable treatment (i.e., qualified for a job), and (d) that others not members of the protected group received favorable treatment (e.g., were hired)." *Graul*, 120 F. Supp. 3d at 122 (citing *McDonnell Douglas*, 411 U.S. at 802). Adjusting those elements to the context of Ms. Larocque's case, she must show (a) membership in a protected group; (b) an adverse action by the Spring Green Defendants, such as failure to provide requested service or stringent enforcement of rules; and (c) evidence that others who are not members of the protected group received superior service or more lenient enforcement of the rules.

There is no dispute that Ms. Larocque, as a self-identified Jewish lesbian, is a member of two protected classes. Both the FHA and the RIFHPA expressly protect

8

against religious discrimination.  *See* 42 U.S.C. § 3604(b); R.I.G.L. § 34-37-4(a).  The RIFHPA also explicitly forbids discrimination based on sexual orientation, *see id.*, and although the FHA's text doesn't include the same phrase, the Supreme Court has interpreted the term "sex" in Title VII, an analogous statute, to include sexual orientation.  *See Bostock v. Clayton County*, 590 U.S. 644, 662 (2020) ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex.").  *Bostock*'s reasoning about Title VII compels the same result for the FHA.  *See, e.g.*, *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 295 (7th Cir. 2000) (explaining that the two statutes are "functional equivalent[s]" and thus "are given like construction and application").

Next, Ms. Larocque must show (1) that the Spring Green Defendants acted adversely against her and (2) that they provided superior treatment to others who are not members of the protected classes she's in.  Here is where she comes up short.  The Court addresses her specific claims in turn.

### 1. Enforcement of Community Rules

Ms. Larocque initially alleged that the Spring Green Defendants enforced rules against her "more strictly than other tenants."  (ECF No. 1 ¶ 24.)  The claim fails to meet muster for at least three reasons.

First, she hasn't provided any evidence of adverse action.  As she has since admitted, she has "never been subject to a fine in connection with the enforcement of a community rule."  (ECF No. 40-4 ¶ 51.)  Further, the only notable example she

9

offered of a rule nominally being enforced against her was when Ms. Cole, then the property manager, "asked [Ms. Larocque] to cut her grass." *Id.* ¶ 52.

Second, Ms. Larocque failed to show that she was treated any differently than her neighbors. *See Gallagher v. Magner*, 619 F.3d 823, 831 (8th Cir. 2010) ("Disparate-treatment claims under the FHA are tested under the same framework as Title VII disparate-treatment claims … did the defendant(s) treat the plaintiff(s) less favorably than others based on their race, color, religion, sex or national origin?"). As she admits, she has not spoken to her neighbors in nearly five years and largely "has no knowledge how the Spring Green Defendants have enforced the community's rules with regard to other Tenants." (ECF No. 40-4 ¶ 53.) Without providing the Court a yardstick to measure against, she cannot show that she was treated differently than her neighbors.

But even if Ms. Larocque showed that the Spring Green Defendants enforced rules more stringently against her than other tenants, there is a third problem: she has not provided anything to support a reasonable inference that her protected characteristics were the cause of that disparate treatment. *See Batista*, 776 F.3d at 44 (affirming summary judgment for defendants when the plaintiff "put forward no evidence, nor pointed us to any, to suggest that an impermissible, disability-based purpose motivated" the defendant's actions). Because Ms. Larocque has failed to meet this modest standard, summary judgment for the Spring Green Defendants is appropriate on this claim.

10

### 2. Maintenance Requests

Ms. Larocque also alleged that the Spring Green Defendants "repeatedly ignored" her "when she requested maintenance done on her property." (ECF No. 1 ¶ 20.)

Claims in this register fail for largely the same reasons as above. Ms. Larocque stumbles out of the starting blocks by failing to show any adverse actions. The Spring Green Defendants offered more than thirty instances, all dated and some even time-stamped, where Ms. Larocque requested and was provided adequate maintenance services. (ECF No. 37-2 at 2–5.) In response, Ms. Larocque mainly quibbles with the particulars, but in doing so, she raises no genuine question of material fact about how the services provided bore on the claims of discrimination originally alleged. (ECF No. 40-3.) And again, she fails to show that the Spring Green Defendants treated her any differently than her neighbors. *See Gallagher*, 619 F.3d at 831.

Finally, she fails to lead the Court to any admissible evidence suggesting that the Spring Green Defendants' maintenance service—even as she described it—was motivated by animus against her for protected characteristics. *See Batista*, 776 F.3d at 44; *see also Marbly v. Home Prop. of N.Y.*, 205 F. Supp. 2d 736, 744 (E.D. Mich. 2002) (granting summary judgment when the plaintiff had not "supported with evidence his claims that he was denied timely maintenance" or "come forward with evidence that non-minority tenants were provided timelier maintenance under similar circumstances"). Therefore, summary judgment for the Spring Green

11

Defendants is also appropriate on the claims arising from disputes about maintenance requests.

### C.   Third-Party Liability

That leaves one last issue: can Ms. Larocque recover against the Spring Green Defendants for their indifference to Mr. Garrett's purported harassment?

Recall that Ms. Larocque found a wire shaped like a noose and a bullet casing on her property line and a swastika on her mailbox in the spring of 2021.  She blamed Mr. Garrett, in part because he often worked on his aunt's property near the area where she found the noose and bullet casings and in part because of previous disputes with him.  After she found them, Ms. Larocque filed reports with Ms. Cole, the property manager, but Ms. Cole "did not confront Mr. Garrett" about the incident. (ECF No. 43 ¶ 30.)

Ms. Larocque now contends (1) that this incident amounts to a cognizable "hostile housing environment" claim under the FHA and (2) that the Spring Green Defendants' failure to intervene subjects them to liability.  If the FHA does not cover deliberate indifference to a third-party's actions, it is immaterial to deciding this Motion whether this incident establishes a cognizable hostile housing environment, so the Court first addresses the question of third-party liability.

The natural starting point is statutory text, but here, text doesn't take us far. Remember that 42 U.S.C. § 3604(b) makes it unlawful "[t]o discriminate … because of … sex," among other characteristics, and 42 U.S.C. § 3617 forbids a housing provider from interfering "with any person in the exercise or enjoyment of … any right

granted or protected by section ... 3604 ... of this title." Still, that only tells readers what is forbidden, not who is responsible for discrimination when it happens. The Seventh Circuit put it best: "On its face, the [Fair Housing] Act does not address who may be liable when … discrimination occurs or under what circumstances." *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 863 (7th Cir. 2018).

Without relevant text, Ms. Larocque turns to precedent—specifically, the Seventh Circuit's decision in *Wetzel*, 901 F.3d 856. There, the court held that the FHA imposed liability on housing providers for harassment by third parties when the housing provider "had actual knowledge of the severe harassment" and was "deliberately indifferent to it." *Id.* at 864. The court did so in large part because of the FHA's striking statutory similarities to Title IX. *Id.* The Supreme Court previously held that Title IX permitted liability against a school for "its own decision to remain idle in the face of known student-on-student harassment in schools," so the Seventh Circuit reasoned that the FHA contained the same cause of action for deliberate indifference. *Id.* at 864 (quoting *Davis v. Monroe Cnty Bd. Of Educ.*, 526 U.S. 629, 639 (1999)).

Still, this Court does not need to consider whether, as a matter of statutory interpretation, the First Circuit would agree with the Seventh Circuit's conclusion. Even assuming there is third-party liability, the *Wetzel* court circumscribed it in two important ways. Both are salient here.

First, *Wetzel* limited the places where the housing provider's duty to prevent harassment arises. "The duty not to discriminate in housing conditions," the court

13

explained, "encompasses the duty not to permit *known* harassment on *protected* grounds." *Id.* at 864 (emphasis in original). Applied to Ms. Wetzel's case, the landlord had "responsibility over the common areas of the building," like the common living and dining areas, as well as common laundry facilities and hallways. *Id.* And that was especially important because those areas were "where the majority of Wetzel's harassment took place." *Id.*

The second limitation on liability concerned the housing provider's powers to stop harassment. The court explained that "liability attach[ed]" in *Wetzel* because St. Andrew had "an arsenal of incentives and sanctions … that can be applied to affect [tenants'] conduct but fails to use them." *Id.* at 865 (internal quotation marks omitted). For instance, it had the power to evict any tenant who threatened "the health and safety of other individuals" or otherwise unreasonably interfered with others' enjoyment of the property. *Id.* And, as the court explained, "St. Andrew could have suspended privileges for tenants who failed to abide by the anti-harassment policies," but it instead restricted Ms. Wetzel's privileges throughout the building. *Id.*

So, even if the *Wetzel* rule applies, the Spring Green Defendants fall outside its reach. Here, the alleged harassment took place not in common areas within a single building, but primarily on private property lines between a land tenant and a home tenant. The conduct here also differed in kind, quantity, and degree from the harassment at issue in *Wetzel*. Ms. Wetzel, for fifteen months, "was bombarded with threats, slurs, derisive comments about her family, taunts about a deadly massacre, physical violence, and spit." 901 F.3d at 862. And while other tenants, all who signed

14

the same community agreement, harassed Ms. Wetzel, the situation at Gaspee Point is more complex. While Ms. Larocque rents the home she lives in, her next-door neighbor Ms. Allin does not—she owns her home and only rents the land. (ECF No. 37-1 ¶ 15.) Spring Green thus has far less control over Ms. Allin than St. Andrew did over Ms. Wetzel's neighbors. To boot, Mr. Garrett is one step further removed from Spring Green, because he does not live on the property. In short, Spring Green lacks the "arsenal of incentives and sanctions" against Ms. Allin and especially Mr. Garrett that drove the outcome in *Wetzel*, so third-party liability is inappropriate.[4]

This reading of *Wetzel* tracks other courts' treatment of it. In *Francis v. Kings Park Manor, Inc.*, for instance, the Second Circuit declined to extend the *Wetzel* rule to hold every landlord responsible for every tenant's conduct. 992 F.3d 67, 77–78 (2d Cir. 2021). The court explained that St. Andrew "had unusual supervisory control over both the premises and the harassing tenants," and the landlord there "was alleged to have affirmatively acted against the plaintiff." *Id.* at 77–78. While liability was appropriate in Ms. Wetzel's case, it did not reach more typical landlord-tenant relationships.

Because, even assuming that the FHA imposes some third-party liability, the *Wetzel* rule does not impose liability on a housing provider for failing to respond to

---

[4] The HUD rule interpreting the FHA that Ms. Larocque identifies, 24 C.F.R. § 100.7(a)(1)(iii), is unavailing for the same reasons. (ECF No. 40-1 at 7.) It requires landlords to step in if they knew about the conduct and "had the power to correct it," but, as explained, the Spring Green Defendants have no power over Mr. Garrett. *Id.*

15

the conduct of a land tenant's non-resident nephew, the Court will grant summary judgment for the Spring Green Defendants on this claim.

## IV. CONCLUSION

For these reasons, the Spring Green Defendants' Motion for Summary Judgment (ECF No. 37) is GRANTED.


IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge
September 16, 2024